Mr. O'Rourke, you may proceed. Thank you, Your Honor. Good morning, Your Honors. For over 12 years, the defendant, Brian Smith, worked as a financial advisor for Deere Employees Credit Union. During that time, he had intimate or integral relationships with numerous... Did he work for John Deere the entire time, or was he working for another company during that 12 years? Initially, Your Honor, it was with CUNA, but he was doing the investment advising for Deere Credit Union through CUNA. Did he pay commissions through CUNA, too? I'm not sure that it's clear whether he was paid a commission or salaries through CUNA, but initially, it was paid through CUNA. That's correct. But he wasn't working for Deere at that time. He was advising Deere. Correct. Technically, he was working for CUNA, who had a relationship with Deere. And Deere housed him in their facility and made their customers available to them. Correct. Deere... When did he sign on to Deere? 2009, Your Honor. And Deere kind of stole him away from CUNA. No, I don't believe that's accurate. What happened was CUNA and Deere decided to part ways. CUNA was no longer providing advising services. He did a good job, and Deere said, come with us. Certainly. And he had been intimately involved with advising all of the Deere Employees Credit Union members that entire time. So even though he was technically employed by CUNA up until 2009, CUNA was working in-site, on-house, with Deere, giving the financial advice. When you say all John Deere employees, wasn't he housed in Moline only? Are there more than one facility? There's more than one facility. He was housed in Moline. His customer base was across the country. So a number of customers that he advised, or a number of members he advised, were located throughout the Midwest and across the country. All John Deere Credit Union members? Correct. John Deere Credit Union, John Deere employees, or actually Deere Employees Credit Union, Your Honor, you can only be a member of the credit union if you're an employee of John Deere or a family member of an employee of John Deere. So that's the limited universe of members of Deere Employees Credit Union. Do you know how many people he actually provided services to while he was there? We do. What's the number? It's about a little over 400 was the number in evidence. At trial, Your Honor, about 460 during the last two years of his employment, which is the relevant time frame for purposes of the non-solicitation agreement. Do you know how many of those 460 started out as CUNA, people that were contacted while he worked for CUNA? Well, they were all Deere employee members. CUNA itself did not have a membership. CUNA was simply there doing the advising. What was in the record at trial is approximately 320 of these members were members of DECU before he ever became involved in 2002 providing financial advising services. Other individuals became members of Deere Employees Credit Union throughout the years based on their affiliation with Deere and their employment at Deere and Company. Okay. I know I've interrupted your argument. Go ahead. No, certainly, Your Honor. And those are important questions because what we're dealing with here is a situation where throughout those 12-plus years where he was advising Deere Employee Credit Union members, he developed very substantial relationships with them. In early 2015, he began exploring a new opportunity with LPL Financial, which is a competitor of the credit union. In early March 2015, he decided he was going to leave the credit union and go to work for LPL. He didn't tell anyone at the credit union he was going to do that at the time. Instead, he made an extensive list of 200 to 250 A-list members and provided that list while he was still employed by the credit union to LPL. He did that so LPL could send letters to them once he quit announcing his relationship with LPL. He did it by his own testimony in hopes that these customers, these members of Deere Credit Union, would follow him. He did it knowing he had a non-solicitation agreement, and he did it in direct violation of the Deere Employees Credit Union policies and of federal law. You're going to hear some argument that, well, he created this list based on his knowledge of the members he was working with. He acknowledges, however, and he acknowledged during his testimony that the member names themselves are confidential, and that's important. The federal law we've cited, the Graham-Bliley Act, demonstrates and specifically advises financial institutions the fact that an individual has an account with your institution is confidential. The name of the person is confidential. So he disclosed all of this in hopes that these individuals would follow him when he left. Eventually, we filed suit asking the court to enforce a non-solicitation provision that's contained within the agreement that he signed. There was a TRO hearing and subsequently a preliminary injunction hearing, and we made it clear at that time that we were only seeking to enforce one provision of the contract, specifically that provision dealing with the solicitation selling to or servicing members that he had provided services to during his final two years' employment at Deere Credit Union. At no point in time did we try to prevent him from working for this competitor, did we try to prevent him from working as a financial advisor, or from earning a living. Instead, the credit union was simply attempting to protect its interests and its members that it developed over many, many years and spent thousands of dollars and resources on. The circuit court recognized correctly that the credit union has a legitimate interest in protecting those relationships. It prohibited Mr. Smith from soliciting or marketing to these members. Where we believe the circuit court erred was that it refused to prohibit Mr. Smith from making sales or providing services to the same category of members. We believe this was an abuse of discretion because essentially, by allowing him to sell to and provide services to the members, while at the same time purportedly prohibiting him from soliciting them after he had already sent them the letter notifying them that he was with LPL, essentially the circuit court's ruling guts the whole purpose and reasoning behind the non-solicitation agreement. And to understand why, I think it's important that we consider some of the background. Mr. Smith started providing the advising services to the members in 2002. He had no prior relationship whatsoever with the Deere Employees Credit Union members. He admits, he acknowledges that the only reason he had developed those relationships over the years is because the credit union employed him and put him in touch with these individuals. This is different than members of Wells Fargo. Any one of us could go be a customer of Wells Fargo. Any one of us could be a customer of U.S. Bank. We could not become members of Deere Employees Credit Union because of the closed nature of the credit union. He admits he only developed those relationships with those members because of his employment through the credit union. His experience and his members he was advising grew substantially over the years to the point where in 2015 when he resigned, he was managing $110 million worth of investment assets or about 73% of the total assets under the credit union's management. He was a big player, a substantial player, and he had relationships with the A-list customers, the A-list members, because of his employment at the credit union. During the last week of his employment, without telling anyone at the credit union he was leading, is when he made this list. And he didn't target just anyone. He targeted and made the list of 200 to 250 A-list members. When we say A-list members, we're talking about the members that have the most significant investments. These are the members that if you're providing financial advising services, you want to work with you. He provided that list. He gave it to LPL in direct violation of the Deere policies that he knew of and that he agreed to and he signed on to be governed by, and in violation of the federal law that we cite in the brief. He abruptly quit on March 27, 2015, a Friday afternoon, waited until after everyone else had left, and dropped his resignation letter on his boss's desk at that time. He no longer considered himself an employer over the weekend, but yet he still continued to come into the credit union to take things out. In fact, he went as far as to provide advising services to a member that weekend without telling her he no longer considered himself an employee of the company. They then sent out the 200 to 250 letters, him and his new venture, LPL Financial, and in fact, in response, a number of members have transferred their account to Mr. Smith. How many? Twelve to 17 was his estimate, Your Honor, at the preliminary injunction hearing. In terms of dollar-wise, he could not give us a figure, I don't believe, or profess not to know it. I mean, this may be an irrelevant question, but in addition, I mean, in opposition to injunctive relief, is there another way for Deere to, in other words, can they go after profits that he makes off of these clients? Well, the difficulty of that, Your Honor, is twofold. One, the circuit court recognized that the harm is irreparable and that there is no adequate remedy at law because the harm is presumed in cases like this, and that's because you don't know what the future holds in these sort of services. While I may have an account today and I may leave and follow Mr. Smith and invest with him, I could look at it and determine, okay, what did that particular account make over the next year? We can't foresee it five years, two years, three years, ten years down the road. It's simply very hard to predict and analyze, which is why you have the irreparable harm. But, Kelly, your lawsuit asks for monetary damages. I assume you can measure those. It's an alternative pleading, Your Honor, and, in fact, in almost all of these type cases where you have the non-compete and the non-solicit agreements, when you read the cases, they seek both as an alternative. In reading your complaint, Count 1, the breach of contract, Count 2, you didn't ask for specific performance. You simply asked for injunctive relief, and I presume that was to maintain the status quo for the breach of contract action. The injunctive relief, Your Honor, is to enforce the non-solicitation agreement that he entered into. You didn't ask for specific performance, though, in Count 2. I may be wrong. How will you read the complaint? Well, I'm not sure what you mean by specific performance, Your Honor. When you look at these non-solicitation and non-compete cases, and I've handled a number of them over the years and read a number of them, they always ask for injunctive relief, and the reason you do that is to stop the bleeding right away. Right. And you can't get specific performance of an employment contract because of a slavery issue. I mean, you can't make the guy work for you. Certainly, and we're not asking. So you're just saying you can't go over there and solicit these people to work for these people. We're actually not. You can't service these clients. Yes, we're not. That's injunctive relief. Exactly, and that's how all of these cases are teed up procedurally when you read them, is you seek injunctive relief to stop the bleeding right away, because the longer this goes, the more he can poach clients and the more damage he can do, which is why in these type of cases you get in immediately to get the injunctive relief to stop things and to prevent that heart. Because of the breach of contract, and then you're going to ask for monetary damages later. I presume. Maybe not. Are you seeking monetary damages? Yeah, at this point the thrust of the case is to have the injunctive relief enter. There is an alternative claim for damages, but, again, you get back to the fact that there always is in these type of claims, and that's why. I just don't normally read complaints. It's count one of a complaint being the alternative relief sought, but I will reread the complaint with that in mind. You can get both, can't you? In other words, if you enjoin him and he's made profits from the time, and there you can get both. Absolutely. Yes, you certainly can. That's correct. I have a question regarding the DEAR policy that prohibits the dissemination of the names of those DEAR employees or members, I guess members is a better term, and then the federal law. Do you have a separate cause of action for that independent of the non-compete clause? Because as I read it, the non-compete agreement discusses contact after the termination of the contract. Here it seems like the list was compiled and disseminated prior to the official end of his contract. So in terms of that, is that a separate cause of action that you have, or is it all rolled into the same? There's a couple ways to look at that, Your Honor. Number one, first of all, we do not at this point in time have a separate count pled for the dissemination of the names. We only learned in discovery after the case was filed and during Mr. Smith's deposition that he had, in fact, done this. We suspected it, but we had no evidence that, in fact, he had compiled a list and then provided it to LPL. During his deposition, he admitted doing so. He admitted compiling the list during the last week of his employment. I believe, Your Honor, his testimony was he then disclosed the list that he compiled after the end of his employment. Procedurally, the way it was teed up, it was more important to get the injunctive relief entered than to amend the complaint and delay things to include another count for that. But I think there arguably certainly could be a separate count for that, for the violation of And we don't know whether that federal law gives a private cause of action or whether there's just a federal action in the name of law enforcement issues or something. We have not taken a position that the federal law gives a private cause of action. The position we have taken is that the federal law demonstrates, in fact, that this information is confidential and must remain confidential. And that's why the federal act is cited and the FTC guidance from it. So what we come down to, essentially, with the trial court's ruling, is a situation where the trial court says, okay, you cannot solicit or market to these members, but you can sell to them if they approach you or provide services if they approach you. Thank you. The problem with that is it effectively, as I said, guts the teeth and guts the whole purpose behind it, especially after this gentleman disclosed the names to a competitor and they sent their 200 to 250 letters out. By that point in time, to use an old siloquy, the horse is out of the barn. He's already notified them. He's now providing services to them. He's being allowed to benefit from his breach of the agreement, regardless of whether they consider it a solicitation. I think common sense shows us that's the whole point. He said he hoped the customers would follow him. They sent the letter. In order for the non-solicited agreement to have teeth, it has to be enforced entirely to prohibit him not only from soliciting, but also from selling or providing services to these members that he developed relationships with on dearest time and on dearest dime over many, many years. I'm going to follow up with your last thought. Your statement was the non-solicitation agreement needs to have teeth. That's why they have to be carefully prepared in the beginning. Otherwise, they're unenforceable. Didn't the trial judge find that this agreement as prepared was far too broad to be enforced? The judge found that a subsequent paragraph after what we were seeking to enforce was too broad. Was there a severability clause in the restrictive covenant that was prepared? There was not a severability clause. As we've addressed in the brief, Your Honor, one is not required to enforce these agreements. The cases we've cited have demonstrated that if you're seeking to enforce a clause that is not too broad and a clause that is narrowly tailored, which is what we're trying to enforce, and not something that's overly broad, then that's fine. That's what the cases have said. Wouldn't you put your client in a better position if the agreement was narrowly construed in the beginning so you don't have these arguments that it's against public policy to enforce it? Well, the provision we're seeking to enforce, in fact, is narrowly tailored to apply to only those members he's dealing with. I understand. Do you agree the entire agreement is enforceable? We're not seeking to enforce the entire agreement, Your Honor. There's one paragraph that they like you to focus on that really, frankly, has no ---- But the judge made a finding the agreement was unenforceable as a whole. No, the judge ---- And modified the agreement. The judge made a finding that the paragraph we were seeking to enforce was enforceable because there is a legitimate interest in protecting our interests. But it's the judge's modification that you're appealing. We're appealing the judge's refusal to enforce a certain ---- basically, two or three words of the provision we're seeking to enforce. Was there a do not solicit agreement with SUNA or CUNA? Yes. There was? Yes. It was virtually the same agreement, Your Honor. Any of the people that he contacted after he left, were those clients before you severed your relationship? I don't know that that came out in testimony, Your Honor. I do know that the entire time, and I think it's ---- I don't understand how the restrictive agreement that you drafted to apply to Mr. Smith after he left employment with Deere could apply to conduct that occurred when he was employed by SUNA if you had a similar restrictive covenant with SUNA. It seems to me you should be going against SUNA. Your Honor, his agreement that he signed with CUNA, and I believe it was entered into evidence. I'm not certain of that. But it was on behalf of ---- He was doing the advising for the Deere Employees Credit Union through CUNA, and the agreement was binding on him with CUNA and Deere. That's how he agreed to it. Well, CUNA's been gone for more than two years, right? Yes, certainly. So it's irrelevant. We're talking about ---- He signed the agreement with Deere Employees Credit Union in 2009. He was dealing during his last two years of employment, 13, 14, early 15, that time frame, with a number of members, all of Deere Employees Credit Union, just like he had his entire time. How many new members that came to him after your relationship with SUNA terminated? How many new relationships he developed while employed by Deere? I don't think there's any evidence there, Your Honor, because the fact is, even when he was employed by CUNA, he was advising Deere Employees Credit Union members. You're not enforcing any agreements. You're not seeking a breach of contract for those agreements that existed prior to 2009. So my question is very specific. How do you think he stole clients that came to him when he was an employee of Deere? Because that's the restrictive covenant you're trying to enforce. Because the members that he always provided services to were always Deere Employees Credit Union members. And his relationship the entire time was with CUNA, Deere Credit Union, and himself. You can answer my question. And, Your Honor, with all due respect, that's not an issue they've raised on appeal. And they've not alleged on appeal that somehow there was no legitimate business interest in enforcing this. Thank you. Thank you, Mr. O'Rourke. Mr. Nell? Good morning. I will address in this argument both DECU's appeal and our cross-appeal. In our brief, we discussed our cross-appeal first and then went into the DECU appeal. I'd like to inverse that, if I could, because you just heard Mr. O'Rourke's argument. I'd like to address that right away. And then in the remaining time, I'll address our cross-appeal. In their appeal, they're arguing that they're trying to enforce just one portion of a restrictive covenant so that its entire thrust, as you heard here today and in their brief, is always just on one aspect of an entire covenant that they chose to put into a contract that they drafted. They didn't even set forth the entire covenant in their brief. We did, but they didn't. We don't think that it's proper to dissect this covenant, tear it apart in little pieces, as they're trying to do. Why would they? Because that's the basis for their appeal, that the judge just selectively chose. Well, they're saying that they want the judge to enforce the entire part of what they call an anti-solicitation clause, which I'll deal with in a few minutes. But what I would like to address at this point is even if the judge, which he did, just chose to enforce one portion of the agreement. In other words, he prohibited – I'm sorry, he did not prohibit Mr. Smith from selling because he said it was overly broad and therefore was unenforceable. So he said, you can sell, you just can't go out and solicit people. You can't call them up and say, let's have lunch. I've got something to talk to you about or show you a new product. But you can sell because their contract that they chose to draft is unenforceable and too broad. And in Illinois, as the court is well aware, restrictive covenants are not favored because they are, they do prohibit competition and they are in restrained trade. And in 2011, the Illinois Supreme Court spoke to us in the reliable fire case and said that a covenant can be no greater than is needed to protect that employer's interest. Now, they, as I say, want to term the part that the judge granted their relief on as an anti-solicitation clause. But here, they add things to it. So in their, what they call their anti-solicitation clause, they also said you can't sell. When you add those things, then you're subject to the higher threshold that applies to all these covenants. And that's because you're seeking to restrict the activity of non-signers, that is, the customers. And you're restricting customer choice. And that's very important in this field. And Mr. Lewin, who is the CEO of the DECU, said that in his affidavit and in his deposition. In this case, the court did not abuse its discretion in finding that the restriction is overly broad. And because it must be reasonable under the reliable fire case. And to do that, there are three prongs. This falls, fails in all three tests. One, it can be no greater than is reasonable and necessary to protect the interest of the employer. This is a covenant that they want to, that they put into their contract, that they don't want to walk away from. Prohibits all, it's not time limited. So it would be applicable to people who are no longer members of the credit union. Former members, because it's like everybody that has ever been a member of this credit union. It would apply to persons who established a securities account at the credit union, regardless of whether Mr. Smith dealt with them or somebody else dealt with them. The protectable interest is their sole argument, that's all they talked about. And all they wanted to talk about were the circumstances of our client's departure. But they really didn't want to focus on the legal issue, which is why their covenant is so broad that it's not enforceable. Just so we can get things narrowed here, okay, and so we know what we're talking about. Whether or not Deere wants to enforce this section is irrelevant. What is relevant is whether the trial judge got it right that that provision rendered the contract, that provision was overly broad and unenforceable. Whether they want to enforce it or not is not the point. If I've got a contract, I can choose to enforce part of it or all of it. And then your position is if the judge is right that this is overly broad, and because there's no severability clause, that contract sinks or swims as a whole. Am I at that point? You're getting ahead of my argument, but you're absolutely right. That's going to be my cross, what am I saying? Okay. I'll get to that in just a moment, but you're absolutely right. That lack of a severability clause is very, very crucial in this case. The counsel brushed over it, but I'll address that in a minute. But I want to talk just before I get to that, just on these three prongs. So we have under the reliable prior case, it can't be overly broad, it can't be more than the employer needs. Here, how would it be necessary for the credit union to have protection against our client doing business with somebody who had formerly been a member but had retired or had just moved their account out of there to a different credit union? Or that he had never met. Or that he's never met, because they say everybody, that's 32,000 people, and I'll get to that in a moment, Your Honor, but 468, you heard counsel say it. That's not in the last two years. According to their affidavit, that's total. Well, if he's inside, whether he's met him or not, probably. If they're still clients of the credit union, he's inside the place, he has access to their names and addresses and whether they're a big hitter or not, and whether it's somebody he wants. Whether he met him or not is a bigger point about whether they're no longer, they've already left the credit union. Well, my point on that, Your Honor, is that if somebody has been a member of the credit union and say they retired from John Deere, they were no longer a member, they chose to take their account out, but the way they've written their covenant, we couldn't sell to them or we couldn't do business with them because it's just overly broad. The second prong in reliable buyer is it can't be harmful to the public, and they seek to impair choice, and choice is very important. As I said, Mr. Lewin admitted that. And the FINRA regulation that we cited talks about how important it is for people to be able to make their own decisions when they're investing their money, who they want to invest it with, who they want to work with. And lastly, it can't impose undue hardship on the employee, and here it's undisputed that Mr. Smith is the primary wager for his family and he had incurred expense of setting up his new business. So certainly it wasn't an abuse of discretion for the trial judge to say that this was overly broad and that our client should be able to sell to people that want to do business with him. And so he did not abuse his discretion because the test is no reasonable person would adopt the court's view. That certainly is not the case here. So in summary, in conclusion, before I go to the cross-appeal, I'd ask this court to affirm the trial court's decision not to enforce the covenant as it pertains to selling securities. Now I'd like to spend the rest of my time on the cross-appeal. I have a question before you move on to that. So you're saying that in this type of employment contract, when there contains one of these non-competition clauses, that at no time can an employer or an employee seek to only enforce one provision? That's right. So that is different than other types of contracts or employment contracts because of the unique provisions? What we're saying, Judge, Your Honor, and I think the cases I'll refer to in the brief and I'll mention here say that when you write a covenant, when you're seeking to restrict people's activity, you have to make it narrow. And if a portion of that is too broad and you don't have a severability clause, which they don't, if it goes down, the entire contract goes down. And that's basically what we're saying. But you're saying that whether or not they're seeking to enforce that portion. It doesn't matter. I'll touch on that in a moment. We agree that the trial judge's decision not to enforce the covenant prohibiting sales was not an abuse of discretion. But we believe that where it did err was modifying the contract, choosing to what they call sometimes blue pencil it or change it to enforce just a portion of it. The standard review here is de novo because now we're talking about contract interpretation. We've cited the McCarthy case from this court and the Moore-Harrity case from the Supreme Court in that regard. Here the DEC overreached when they drafted the restriction. And that overreach makes their entire covenant unenforceable. The trial court severed the portion of the contract that prohibited our client from targeting all DECU members at any location. That's how it reads. You can't target any members of DECU at any location where he was located or any members that he dealt with in the last 24 months. That's an or. So it's all members. And the testimony was that this is the home office so that basically all members are deemed to be members at that location in Moline. That's 32,000 members, and as we said in the earlier part of the argument today, Mr. Lewin's affidavit that he's attached says that Mr. Smith served 468 of those people all the time he was employed there, not just in the last two years total. That is totally overbroad. And it would include former members, and they clearly have no interest in former members. Now it's obvious that they recognize that because in their complaint they ask the court to enforce their entire covenant. In their motion for PRO they ask the court to enforce everything. In their motion for preliminary injunction they say they want the entire covenant enforced. One that applies to all these 32,000 people. But then they said that they needed that to protect their interests. Well, then when we raise this overbroad argument at the PRO hearing, they attempted to back off of that. They said, well, we're only seeking to enforce part of the covenant. Only people he's dealt with in the last 24 months. But they never amended their pleadings. This is obviously a litigation tactic, one that the court should not have permitted. It's important to note that they drafted the contract. There was no severability clause. No clause permitting the court to modify it. And that all courts discourage employers from drafting their covenants overly broad, and then when challenged by the employee say, well, okay, we'll pull it in and only give us this much. Would you discuss the public policy behind that, please? Yes, because what that does, Your Honor, is it forces people who have a lot less money usually than the employer to force them, first of all, a lot of them can't afford to do it. If they can afford to do it, it's very expensive. So, you know, they don't want to encourage employers drafting this thing this broad, and then when challenged come in and say, well, okay, just give us this much. And that's the Cambridge engineering case. We talked about that. The House of Vision case, which is a case they cited, also refused to modify on that basis. Now, in Illinois, a court can only sever a portion of a contract that is not an essential part, unless there's a severability clause. Here, Mr. Lewin's affidavit said this restriction isn't necessary to protect our interests. That affidavit is attached to the verified complaint, which referred to the entire covenant. So he's saying the entire covenant is necessary to protect our interests. They have not cited, contrary to what counsel just said, they've not cited a single case where a court said, well, there's no severability clause, but we're going to sever it anyway. Every case that's cited in both briefs, there is either a severability clause or the subject of severability was not mentioned, so you would assume it wasn't raised. So in conclusion, since this covenant as a whole is impermissibly broad, thus the court should have denied the requested injunction in total. That's the relief we would ask for. Could you speak to the issue of monetary damages? Because as I understand it, count one is for breach of contract seeking monetary damages. Yes. So how can they meet the requirement that a remedy at law doesn't exist when that is precisely, as I read the complaint, the only remedy they saw? Well, they did. Certainly, as counsel admitted, they do have that count pending, and we do believe that that is a remedy that they haven't abandoned by any means. They haven't told us they're dismissing that count or whatever. So I mean, I think it is out there, and I think it is a consideration. But it's not an issue in this appeal? Well, it's not been brought up by either side in this appeal, so I don't want to stretch it. Doesn't an employer take a calculated risk when they prepare an overly broad, restricted covenant? Because sometimes they're never challenged, and so an employee that leaves may comply their behavior to these broad terms. But in a situation such as this where an employee leaves and then doesn't comply, that's where the difficulty in the broad covenants arise. So it's kind of a calculated risk. Well, that's exactly right, Your Honor, and that's why the courts have said, and we've cited several cases where they've said that is not permissible conduct. We don't want to have a policy in this state to let employers get away with that. In other words, don't write this thing so broad that a lot of people will just be intimidated and not do anything, or they won't be able to afford to do anything, or if they do anything, they have to spend a fortune to fight this big employer. They say, don't write it so broad. And then when you're challenged, when you're caught, such as in this case, when we come in, we say, that's impermissibly broad. They say, oh, well, then only give us this much. We're really just only going to ask for this narrow piece. That's not the policy of the State of Illinois. It's contrary to that. Any other questions? Thank you very much. Thank you, Mr. Noll. And you will have five minutes for rebuttal at the end. Mr. O'Rourke, for your rebuttal. Thank you, Your Honor. At the very beginning of the TRO hearing, we made it clear exactly what provision we were seeking to enforce. We've never wavered from that, never changed it since. So the continued argument that we're seeking to enforce a second provision of the contract, a smaller provision later on, simply is not accurate. Well, does it matter? It doesn't matter, Your Honor, but I want to clarify it because – Well, I mean, it's kind of irrelevant to our resolution, right? I mean, the issue is, is it – was the judge right? Did that render that – was that clause overbroad and therefore unenforceable? And if – and was he wrong in the sense that if there was no severability clause, could he sever it and enforce the other part of that contract? In other words, does the contract sink or swim as a whole? It does not, Your Honor, and we've cited the cases that demonstrate that. The McRand case, the same thing that we've done here is what will happen to McRand. ARPAC, Gillespie, O'Keefe, even the Cambridge case that they rely so heavily on that the court can, in some circumstances, choose to modify an overbroad restrictor of covenant rather than invalidate it outright. They've cited no cases in which the court has held that the agreement is automatically void from the get-go because there's one provision in it that a party is not seeking to enforce that may be overbroad. None of the cases they've cited held that, and we went through the cases they rely upon in the reply. So the court absolutely could decide, since we weren't trying to enforce that portion, that it did not have to consider it, didn't have to invalidate the contract. With respect to Mr. Noe's statement that this provision is unlimited in time, it's simply not true. The very beginning of the contractual provision at A13 of their brief, their appendix, states representative agrees that for the two-year period immediately following the termination of the contract, etc., etc., he won't solicit, won't sell or provide services to. So this is not a lifetime restriction. This is a two-year restriction. They haven't challenged the reasonableness of that. And I think what's important to keep in mind is the council wants to muddy the water and talk about non-compete cases being overbroad, etc., etc., but the courts drive fine distinction between non-solicitation cases and non-compete cases. A non-solicitation case, which includes provisions prohibiting you from selling to certain customers or certain members, are activity restraints. They're not competition restraints, and that's an important difference because the activity restraints, the non-solicitation restraints, are subject to a much lower scrutiny than if we were trying to say, Mr. Smith, you cannot work in the financial industry at all. Mr. Smith has thousands and thousands and thousands of customers he can focus on and target. He testified at the preliminary injunction hearing. His customer base is the Quad Cities, 350,000 people, and beyond, the entire Midwest or the entire country. We're trying to prohibit and protect our relationship with a very small universe, approximately 400 customers out of the thousands and thousands of people he can target. He testified at the preliminary injunction hearing. He's left other employers, started up fresh, and done just fine, and he can do that again. It's not an argument that they've made in their brief on appeal, but it's an argument Mr. Noy made at the stand, and I think it's important to consider. In addition, the reference to FINRA that Mr. Noy made is rather misleading because the SEC, which enforces the FINRA rules, has clearly stated the rule that they refer to and rely upon does not affect the ability of member firms to use employment agreements to prevent former representatives from soliciting firm customers. Here's the SEC telling us these agreements are fine, and we expect you to have them because we're not preventing it. Justice O'Brien, with respect to your question to Mr. Noy, you have something to the effect of are you saying we can not choose to enforce only one provision, and he said yes, but in fact the cases we've cited demonstrate that we can do just that. They've cited no cases to the contrary. As I explained in my argument, this is not a blue pencil. Yes, a blue pencil is a situation where the court says you can't enforce it against the entire Midwest, but you can enforce it in the states where you do work. So you actually cross out a restriction of 500 miles and restrict it to 100, cross out five years and restrict it to two years. This is a different situation. It's not a modification. It's choosing to enforce a certain provision, and it's not subject to the higher threshold that Mr. Noy alluded to, and he cited no case law to support that. In order for this non-solicitation agreement, which the judge found correctly, was enforceable to have teeth, you need to enforce the entire non-solicitation agreement. You need to also prohibit him from making sales to the individuals that he dealt with during his last two years, and that he violated policy and federal law by disclosing names and sending a letter from a competitor. Thank you. Thank you, Mr. Eilert. Mr. Noe? Thank you. In the five minutes that I have, I'll just try to hit on a few things that I think are very important. First of all, Council stood up here just now and said that the contract does not have to sink or swim, but it can be parceled out, and he cited the Rand case and he cited the Cambridge case, and in both those cases there was a severability clause. We forgot to mention that apparently, but it's a very different situation. He said we haven't cited a single case in which the court has said, well, you can't sever and keep the contract enforced. Of course, we've cited cases where it says an essential term cannot be severed in the absence of a severability clause. One of them is that Keppel case that's in our brief, holding it where an essential provision of a contract violated public policy, the entire contract, including the non-solicitation clause, is void and unenforceable. So we have cited that because it comes in the context of an essential term. Now he says that the, he talks about the federal law that he talked about in his first argument, and he came back to that again. First of all, that doesn't apply to Mr. Smith, it only applies to financial institutions. Secondly, there's no private cause of action under that law. Justice Smith asked about that earlier this morning. So basically what we have in essence here is this credit union chose to make their contract so broad that it would apply to 32,000 people, it would apply to retirees, it would apply to people who are no longer members, people we never, Brian Smith never knew, never saw. Not this little 468 pot. They wanted it to be applied to everybody. When they were faced with that, they suddenly said, well, wait a minute, okay, let's restrict it, let's only limit it to this little smaller group. They can't do that, because what they're doing is they've chosen, they've made their bed, and they've got to sleep in it. They can't have this wide, broad net, and then when challenged, pull it back, because that's not fair to the employees. Okay, but I was hoping you'd bring up fairness and equity. What's fair and equitable about somebody like your client who goes into his employer and walks out with a client list and gives it to a competitor? Well, first of all, he didn't give his client list to a competitor. That's not what happened. How did the OPL get the names and addresses of the people they sent letters to? Well, first of all, they didn't send letters, Justice Smith. What happened was Brian Smith, from memory, had 200 or 250 people he'd done business with. He did not use their resources to create that. That was from his own mind. What he did was... Well, if you went into the office and you've got a photographic memory or a Kodak camera and you acquire this information from your employer and then go out and use it elsewhere, what's the difference, how you got it out of there? Is it through your really great memory or a photograph or a photocopy? Well, I guess what I wanted to explain was they made this claim in their argument in a briefing today that we gave it to a competitor. The competitor, first of all, we just simply did a ministerial task, a secretarial task of typing up these tombstone letters, which the trial judge found very correctly, are not solicitation. They're customary in the industry to let people know where I am now located. He didn't say, please come to me. I can do a better job than they can. I got a better product at a cheaper price. He just said, I am now at this location. That goes back to customer choice. That's what's so important under FINRA and under the policy of the law, that people should know where this person is. If they want to choose to stay with Brian Smith, they can. And if they don't want to choose to stay with Brian Smith, they will stay at the credit union. And a lot of people have. Thank you. A lot of people have stayed at the credit union, and that's fine. That's their choice. So in summary, Your Honors, we would ask the court to rule that the entire covenant fails because of its overreaching, overbroad nature, and therefore that the court should not grant any aspect of the injunction. Thank you. Thank you, Mr. Miller. Thank you, Mr. O'Rourke. Thank you both for your arguments here today. This matter will be taken under advisement, and a written decision will be issued as soon as possible.